Commonwealth *v.* DiPaul, Appellant.

Argued March 2, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, PARKER, JAMES and RHODES, JJ. Judgment and order appealed from,

*T. G. Wadzinski,* with him *Nelson A. Bryan,* for appellant.

*Harold G. Teel,* District Attorney, for appellee.

OPINION BY RHODES, J., April 24, 1936:

Defendant pleaded guilty to the charge of arson. Before sentence he petitioned the court to be allowed to withdraw his plea of guilty and to enter a plea of not guilty to the indictment. The district attorney filed an answer, and a hearing was held before the court below. Defendant's petition was refused, and he was sentenced on his plea. The defendant appeals to this court, and assigns as error the refusal of his petition to withdraw his plea, and the imposition of sentence. The question involved is, Did the court below abuse its discretion in refusing to allow the defendant to withdraw his plea of guilty?

Section 1 of the Act of April 15, 1907, P. L. 62 (19 PS §241), provides as follows:

"Whenever hereafter, within this Commonwealth, any person is charged with the commission of any crime, and such person is willing to enter a plea of guilty, and shall notify the district attorney to that effect, no bill of indictment charging such offense shall be sent to a grand jury; but the district attorney shall at once prepare a bill of indictment, in the usual form, and the plea of guilty shall, at the request of the said defendant or defendant's counsel be entered thereon, and the court of the proper county at any session thereof, shall thereupon, forthwith, impose sentence for the offense set forth therein: Provided, however, That nothing in this act shall be construed so as to relate to, or change the proceedings in, homicide cases in this Commonwealth: And provided further, That the defendant may withdraw his plea of guilty, at any time before sentence, by leave of the court."

This procedure is not an abridgment of the constitutional rights of the accused. Com. ex rel. v. Francies,

250 Pa. 496, 95 A. 527; Com. ex rel. Wheeler v. Francies, 58 Pa. Superior Ct. 266.

It is a well-established rule that a petition or motion to withdraw a plea of guilty, and to be allowed to enter a plea of not guilty, addresses itself to the discretion of the court before which the plea is entered, and, in the absence of a clear abuse of that discretion, the appellate court will not interfere. People v. Blumen et al., 87 Cal. App. 236, 261 P. 1103; People v. Manriquez, 188 Cal. 602, 206 P. 63, 20 A. L. R. 1441; Com. v. Patch, 98 Pa. Superior Ct. 464, 468. See 20 A. L. R. 1445, 66 A. L. R. 628, 16 C. J. 396.

The withdrawal of a plea of guilty is properly allowed where it appears that the plea was entered through a misapprehension of the facts or the law; where there is doubt of the defendant's guilt; where the defendant has a defense worthy of consideration by a jury; and where the ends of justice will be best served by submitting the case to a jury. See People v. Throop, 359 Ill. 354, 194 N. E. 553; People v. Bonheim, 307 Ill. 316, 138 N. E. 627. See, also, Com. v. Patch, supra.

The withdrawal of a plea of guilty has been permitted where it has been entered in ignorance of the nature of the charge and the consequences of the plea (Krolage v. People, 224 Ill. 456, 79 N. E. 570; People v. Lavendowski, 326 Ill. 173, 157 N. E. 193; Corlise v. State, 94 Fla. 1192, 115 So. 528; Mullen v. State, 28 Okla. Crim. Rep. 218, 230 P. 285; Batchelor v. State, 189 Ind. 69, 125 N. E. 773); where the plea of guilty was not made freely and voluntarily (State v. Poglianich, 43 Idaho 409, 252 P. 177); where the defendant entered a plea through fear (Brown v. State, 92 Fla. 592, 109 So. 627; Nickels v. State, 86 Fla. 208, 98 So. 497, 502, 99 So. 121); where the plea was entered under a misconception of the nature of the charge (State v. Maresca, 85 Conn. 509, 83 A. 635; Farley v. State, 23 Ga. App. 151, 97 S. E. 870); where the plea was entered by mistake, or

without the consent of the defendant (State v. Coston, 113 La. 717, 37 So. 619; Nahas v. State, 199 Ind. 117, 155 N. E. 259); where the plea was induced by threats (Fromcke v. State (Okla.), 258 P. 927; State v. Brown, 33 N. M. 98, 263 P. 502); where the plea was induced by promises of leniency (People v. Grant (Cal.), 274 P. 1005, 275 P. 838; People v. Walker, 250 Ill. 427, 95 N. E. 475; People v. Schwarz et al., 201 Cal. 309, 257 P. 71; People v. Kurant, 331 Ill. 470, 163 N. E. 411; Hart v. State (Okla.), 233 P. 1095; State v. Walters, 48 S. D. 322, 204 N. W. 171; People v. Byzon, 267 Ill. 498, 108 N. E. 685; People v. Campos (Cal.), 43 P. (2d) 274); where the defendant may be found insane at the time of the commission of the offense (Yantis v. State, 95 Texas Crim. Rep. 541, 255 S. W. 180); where the defendant believed that he was pleading guilty to a less serious crime than that charged in the indictment (State v. Manager, 149 La. 1083, 90 So. 412); where the plea was inconsiderately entered (Com. v. Gerrity, 1 Lacka. Leg. Rec. 430).

Defendant's petition to withdraw his plea recited: (1) That, pursuant to gross misrepresentations, flagrant inducements, brutal and inhuman treatment, numerous threats, and other abuses directed to and inflicted upon him, while he was held as a prisoner, he ignorantly and against his own free will and understanding made certain statements and signed and entered a plea of guilty to the crime of arson; (2) that his admissions and statements were made through false inducements and threats; (3) that, prior to making any statements or entering his plea of guilty, he was deprived of the right of counsel or communication with his advisers and family; (4) that he signed and entered his plea of guilty to the indictment charging him with arson, without knowing the contents of the indictment or the effect it had on his legal rights, and that the same was not explained to him; (5) that he was

misled by trick, artifice, and design, and was deliberately misinformed and kept in ignorance of the contents of the papers and the effect of the same on his legal rights, by the officers of the law, before the signing of the same by him; (6) that, by entering a plea of guilty without the proper and thoughtful consideration of the same, he had been deprived of his right to a fair and impartial trial by jury, as guaranteed by the Constitution of the United States and by the Constitution of the Commonwealth of Pennsylvania; (7) that he was not guilty of the charges set forth in the indictment.

What transpired prior to the presentation of the petition by the defendant to withdraw his plea of guilty may be briefly summarized. The defendant conducted a grocery, and meat store at 626-8 Freas Avenue, Berwick, Columbia County, Pa., from September, 1934, to the time of the fire on April 9, 1935. The defendant, together with his family, consisting of his wife and two children, also lived in several rooms of the store building. On the night of April 8th, or in the early morning of April 9, 1935, this building was partially destroyed by fire, under circumstances which indicated that the fire was unquestionably of incendiary origin. The defendant was taken into custody by the state police on the afternoon of April 9, 1935. He was questioned by the police officials and by the district attorney, and finally admitted his connection with the fire and his willingness to enter a plea of guilty before the court. On April 11th, he was given a hearing before a justice of the peace, where he pleaded guilty to the charge of arson. On the same day, the defendant signed a waiver of formal presentation of the indictment to the grand jury, and also signed a plea of guilty on the indictment, which charged the defendant with wilfully, maliciously, and feloniously burning, or causing to be burned, the dwelling house and storeroom situate at 626-8 Freas

Avenue, Berwick, Columbia County, Pa. The court below, following the entry of defendant's plea of guilty, heard testimony on the afternoon of April 11, 1935, that it might be informed of the facts before imposing sentence. At this hearing in open court, the defendant voluntarily took the stand and testified, after being sworn, with respect to the burning of the building and his connection with it. He testified freely, fully, and with no semblance of compulsion. He stated that he was 30 years of age; that he had worked as manager for the A. & P. Tea Company; that in September, 1934, he leased the premises at 626-8 Freas Avenue from the owner, and used them for a dwelling and store; that, upon the expiration of the lease, he thought he would not be able to renew it, but would be obliged to seek another location; that the property might be controlled by the A. & P. Tea Company; that he wanted the building burned so that he might buy the lot from the owner; that he had $1,000 insurance on the furniture and $2,000 on the merchandise and fixtures in the store; that he was after the lot, and conceived the idea of having the building burned as a means to acquiring it; that he understood the owner had the building insured; that he consulted his uncle, Tony Cerullo, about the matter on several occasions; that, on one occasion, he talked to his uncle in the back room of the store about having the building burned; that he asked his uncle whether he knew of anybody who would burn the building, and agreed to pay $400 to have it done; that he saw his uncle again on April 7th at the latter's home; that he told him Monday, April 8th, would be the date set for the fire; that he was usually away each Monday evening, attending a meeting of independent grocers in Wilkes-Barre; that his stock was usually depleted over the week-ends; that his uncle knew these facts; that he made arrangements for the fire on Monday, April 8th, by obtaining gasoline and placing it in the building in

about five containers; that he had the gasoline placed in his car at different filling stations, and then returned to his place of business, siphoned it out of the tank, put it in a number of cans, and placed them in the cellar under the storeroom; that he also had about forty gallons of kerosene in a tank on the premises; that the cans containing the gasoline leaked, and much of it ran out over the cellar bottom; that he noticed the gasoline running out of the cans after he had placed them in the cellar; that, on the same day, he removed most of the family's clothing and bedding and stored it in his uncle's garage, which was located about a block from his store building; that, on the evening of April 8th, he went to Wilkes-Barre at about 8 o'clock; that his wife accompanied him; that he left the rear door to his store building open; that a quantity of groceries and meat were taken to his uncle's that day; that he did not buy any groceries in Wilkes-Barre on the evening of April 8th, although it was customary for him to do so; that he left Wilkes-Barre at about 12:20 a. m.; that he arrived in Berwick about 1:30 on the morning of April 9th; that he saw his building on fire as he approached.

At the same time, in the presence of the defendant, Officer Werst, of the Pennsylvania State Police, testified that, upon his arrival at the scene of the fire on the morning of April 9th, he made an examination of the premises, and three separate and distinct fires were found in the cellar, made from waste paper saturated with kerosene or gasoline; that he found seven lard cans in the cellar; that three of the seven still gave off the odor of gasoline, and one had a quart or two of gasoline in it; that under the cellar steps there was a separate fire; that, in the bathroom upstairs, he found a trailer, made by a rag saturated with kerosene; that it led from the cellar steps to the next room and then to the ice box, which was located in the rear of the store; that

the plaster had been torn off the lath at several places to give ventilation for the fire; that the upholstery on the furniture threw off an odor of gasoline; that he found no bedclothing, such as sheets, pillows, pillow cases, or blankets; that there were no signs that any had been burned; that the mattresses were badly burned, but they could still be identified; that there was a separate fire in a corner of a room in the living quarters, where a bunch of rubbish, paper, and rags had been thrown; that there was but very little clothing in the chiffoniers and dressers; that there was an overcoat on the floor, saturated with gasoline; that there was a relatively small quantity of groceries in the store; that the ice box contained only one piece of pork, a piece of front quarter of beef, a piece of chuck, some lard, some Italian sausage, and some cold meats. The defendant was again called to the witness stand. He testified, as did Officer Werst, that there was about $400 worth of groceries in the store at the time of the fire; that there was a small quantity of meats in the ice box; and that he did about $500 worth of business a week.

The defendant also testified that he made his statement in court freely and of his own will; that he was accorded good treatment at police headquarters; and that he had been treated fine by all of the officers.

Following the hearing, sentence was deferred, and the defendant was remanded to the county jail; bail being fixed in the amount of $5,000. On April 15th, he was released on $5,000 bail, which, on April 25, 1935, was raised to $25,000 by the court; and, on his failure to furnish the same, he was recommitted to the Columbia county jail.

The hearing on defendant's petition to withdraw his plea of guilty, which was filed on May 6, 1935, was held on May 11, 1935. At the hearing on this petition, the

defendant again took the stand, and, under oath, repudiated his plea of guilty and his statement made under oath to the court on April 11th. On this occasion he testified that, after being taken into custody by Officer Werst on the afternoon of April 9th, he was taken to the Bloomsburg barracks of the state police, and then to the county jail, where he spent the night; that he did not have anything to eat that night, and was taken out of the jail at 9 o'clock the next morning before he had time to eat breakfast; that he was then taken to the city hall, where he remained until about 3:30 p. m., when he was again removed to the barracks and questioned by Officers Werst and Newman, and by Mr. McLaughlin, agent of the Fire Underwriters Association, until 8 o'clock that evening; that, during this questioning, he was struck on the jaw by Mr. McLaughlin, called names, and threatened with physical torture; that he was given nothing to eat or drink; that he was promised to be let out on $2,000 bail if he told the truth; that Sergeant Newman promised to get him out on parole; that it was in pursuance of these promises and threats that he made his statement; that, about 8 o'clock on the evening of April 10th, he broke down and answered their questions satisfactorily; that they then took him out for something to eat; that the next morning, April 11th, they took him to the district attorney's office; that he there signed two papers as requested by Sergeant Newman; that he did not know the contents of the papers which he signed; that he did not realize that he could be sentenced without further proceedings; that, after signing the papers, they took him to the office of the justice of the peace; that no papers were read to him in the office of the justice of the peace; that he signed a paper handed to him by the justice; that he did not know what he was signing; that, from the office of the justice, they took him to the courthouse; that he knew nothing of his rights and the legal effect

of the statements and admissions which he had made and signed; that he made his statement before the court because of the promise that he was to be paroled and let out on bail to assist in finding the party who actually burned the building; that none of the papers were signed in the courthouse; that it was after he was out on bail that he learned for the first time that he had signed a plea of guilty; that he was innocent of the charge of arson; and that his previous testimony given before the court on April 11th was all untrue.

The defendant was the only one who testified in support of the petition, except his wife, who testified that she and defendant's uncle, Tony Cerullo, went to Bloomsburg on April 11th for the purpose of entering bail for defendant in the amount of $2,000. The Commonwealth called Officers Werst and Newman and Mr. McLaughlin, who denied ever having threatened the defendant, or having made any promises to him, or that he was deprived of his right of counsel or communication with his family and friends. These witnesses also denied that the defendant was mistreated in any way, but testified that defendant voluntarily, and with full knowledge of the contents, signed the waiver of presentation and the plea of guilty on the indictment. It was shown by the Commonwealth that he was first taken before the justice of the peace, where he was served with the warrant, and where the information charging arson was read to him, to which he pleaded guilty before the justice of the peace; that the transcript was thereupon filed in the clerk's office; that defendant signed no papers in the district attorney's office, but that he signed the waiver of presentation of the indictment before the grand jury and the plea of guilty endorsed on the back of the indictment, after he read the indictment, and after it was explained to him, in the law library adjacent to the court room, on the morning of April 11th, just prior to the hearing before

the court. It was also shown that he communicated with his uncle, who, at defendant's request over the telephone, came to the barracks on the evening of April 10th; that, on the evening of April 10th, defendant also told the district attorney the details of his connection with the crime; and that it was substantially as he testified in court.

Other witnesses for the Commonwealth were called, who contradicted defendant's testimony as to what happened and as to his treatment.

The court below, after hearing the testimony on the petition and answer, refused defendant's petition to withdraw his plea, and imposed sentence upon the defendant.

An examination of the entire record does not disclose that the plea was entered in ignorance of his rights and the consequences of his act, or through a misapprehension of the facts, or through fraud, fear, mistake, threats, promises, inducements, or duress. Defendant freely, fully, and voluntarily testified under oath, at the time of the entry of his plea, as to his connection with the crime. The granting or refusing of the petition to withdraw the plea of guilty was within the sound discretion of the court below, and we find no abuse of that discretion in the refusal to grant the prayer of the petitioner. It would be trifling with the administration of the criminal law to allow the defendant in this case to withdraw his plea of guilty.

The judgment and order appealed from are affirmed.